IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


UNITED STATES OF AMERICA,            )
                                     )
vs.                                  ) # 1:09-CR-358 CAP
                                     )
YOLANDA SCOTT,                       )
                                     )
          Defendant.                 )


SENTENCING HEARING

August 23, 2010


BEFORE THE HON. CHARLES A. PANNELL, JR.


APPEARANCES:


FOR THE GOVERNMENT:     Ms. Teresa Dennon Hoyt
                        Mr. Steven D. Grimberg


FOR THE DEFENDANT:      Mr. Timothy R. Saviello


Reported by:
Martha J. Frutchey
U.S. District Reporter
Room 2314, United States Courthouse
75 Spring Street, SW
Atlanta, Georgia  30303
(404) 215-1573

1                    **Monday, August 23, 2010**

2          THE COURT:  Be seated, please.  Sound case 09-CR-358,

3     United States of America versus Yolanda Denise Scott, set down

4     this morning for sentencing.  Is the government ready?

5          MS. HOYT:  We are, Your Honor.

6          THE COURT:  Defense ready?

7          MR. SAVIELLO:  We are, Your Honor.

8          THE COURT:  All right.  The Court has the presentence

9     report and would like to adopt the portions of the presentence

10    report to which there have been no objection and make those the

11    findings of the Court.  Is there any problem with that on behalf

12    of the government?

13         MS. HOYT:  No, Your Honor.

14         THE COURT:  On behalf of the defendant?

15         MR. SAVIELLO:  No, Your Honor.

16         THE COURT:  So ordered.  Now, let's see if we can take

17    up the objections.  I think there are two by the defendant.

18    First one I want to take up concerns paragraphs 21 and 28 where

19    points are given for obstruction.  Tell me about your objection,

20    Mr. Saviello.

21         MR. SAVIELLO:  Yes, sir, Your Honor.  Essentially our

22    argument on this objection is that Ms. Scott's testimony at

23    trial, which is according to the probation the substance which

24    they think rises to the level of the objection and otherwise

25    justifies the enhancement, we believe does not rise to the level

1    that would justify the enhancement, and we think a closer look

2    than the normal, she testified, she got convicted, she must have

3    been lying approach is appropriate here.

4          And as I have pointed out in our sentencing memorandum,

5    while perjured testimony has often been held to support this

6    enhancement, that still requires that the District Court make a

7    specific finding that the testimony was, in fact, perjured.  And

8    the simple fact that the defendant testified, exercising her

9    constitutional right, testifying in her own defense, and was

10   later convicted does not automatically mean that the testimony

11   was perjured.

12         I cited to the Court two cases which I believe are

13   instructive on this point.  The first one United States versus

14   Hasner, which is Eleventh Circuit case from 2003.  That was a

15   fraud case as well, Your Honor.  In that case the defendant was

16   a real estate agent working for a real estate company in

17   Florida, and she negotiated with the local governmental agency,

18   the head of the local governmental agency essentially a finder's

19   fee for that person, the head of the agency, in that if he

20   steered business from the agency her way, and the real estate

21   transaction was successfully completed, she would funnel back to

22   him a kickback, essentially.

23         She testified in her own defense at trial, and the

24   government pointed out in that case several specific points they

25   said clearly indicated that she perjured herself.  The District

1  Court did not find so, and instead found that, well, they were

2  able to impeach the defendant's testimony.  It didn't rise to

3  the level of proven perjury, which would otherwise justify the

4  enhancement.  The Eleventh Circuit agreed and did not grant the

5  government's appeal on that point.

6      I would argue in that case, Your Honor, the woman

7  testified in her own defense, and the way they impeached her was

8  instructive comparatively to what we have here, that is, the

9  woman testified there was no previous -- or that she testified

10 initially that she denied in her testimony that she had tried to

11 hide from the governmental agency the existence of this finder

12 fee agreement.  That was disproven by testimony from and

13 circumstantial evidence throughout the case that the agreement

14 did exist and other things of that sort.  Secondly, she

15 testified that the fee agreement had, in fact, been disclosed to

16 the governmental agency, when, in fact, the governmental agency

17 had no record of that and there was direct testimony disproving

18 that fact.  And third, that her testimony was that the

19 government, the head of the governmental agency had instead

20 earned a commission for his participation as opposed to it being

21 an improper kickback, again, disproven by the record and the

22 written agreement between the parties in that case.

23      So the level of impeachment there, Your Honor, was

24 pretty significant.  Nevertheless, the District Court in that

25 case found that that testimony did not rise to the level of

1   perjury, and, again, the Eleventh Circuit in affirming that

2   decision said although the government was able to impeach her

3   testimony, we cannot say that the inconsistencies required an

4   upward adjustment.

5       Secondly, Your Honor, United States versus McDonald,

6   which is an Eleventh Circuit 1991 case.  In that case the

7   defendant -- it's a drug case -- the defendant essentially

8   introduced an undercover federal agent to a drug supplier.  The

9   defendant in that case raised an entrapment defense, testified

10  on his behalf, which, of course, entrapment being an affirmative

11  defense.  He testified that the confidential informant in this

12  case working with the government, he had a personal, spiritual

13  relationship with that person, owed the person money, and that

14  the confidential informant coerced him or forced him into

15  introducing the drug dealer to the agent as a way to repay that

16  debt and he otherwise wouldn't have done it.

17      The testimony at trial, of course, included the

18  testimony of the law enforcement agent.  He was present at the

19  introduction.  He testified that there was nothing of that sort,

20  but instead that the defendant in that case was conducting what

21  would be in the agent's experience what would be a normal

22  introduction between a potential buyer of drugs and a potential

23  seller of drugs, and no discussion of entrapment or having to

24  repay a debt, anything of that sort.

25      Again, in McDonald, the government complained that his

1    testimony, defendant's testimony rose to the level of

2    obstruction, and, again, the Eleventh Circuit disagreed, finding

3    that there were inconsistencies and impeachment by the

4    government, but it didn't rise to the level of perjury.

5         So comparing those two factual scenarios with the

6    factual scenarios we have here, Your Honor, we would argue that

7    Ms. Scott's testimony, while impeached by the government, and

8    obviously sufficiently done so to get a conviction, we would

9    argue it did not rise to the level of affirmative perjury.  The

10   only thing that really contradicts Ms. Scott's testimony is Ms.

11   Scruggs, Your Honor.

12        Certainly there were records found in Ms. Scott's house.

13   She gave an explanation for why those records were there, a non

14   criminal explanation.  And but for Ms. Scruggs' testimony

15   explaining her version of how the records -- the information

16   came to her, and about the one thousand dollar payment, so on

17   and so forth, I don't think the government would have been able

18   to make their case.

19        So when you compare Ms. Scruggs' credibility as an

20   impeaching agent versus, for instance, in McDonald, a federal

21   law enforcement agent's credibility as an impeaching agent, if a

22   federal law enforcement agent, who directly impeaches the

23   defendant's testimony, directly contradicts it, resulting in a

24   conviction, if that impeachment is not enough to justify an

25   obstruction enhancement, that is, to justify a finding of

1   affirmative perjury, which is required under these factual

2   scenarios, then Ms. Scruggs who arguably has significantly less

3   credibility than a federal law enforcement agent, specifically

4   considering her life-long history of running cons and fraudulent

5   conduct, we would argue then that the government is unable and

6   the Court should not find to a preponderance that Ms. Scott

7   committed perjury in this case, notwithstanding the impeachment,

8   notwithstanding inconsistencies with the other evidence.  And if

9   you can't find specifically to a preponderance that it was

10  perjury, then the enhancement for obstruction is not justified,

11  and we would ask you to follow the Eleventh Circuit law in

12  <u>Hasner</u> and <u>McDonald</u> and not apply it, Your Honor.

13       THE COURT:  Well, now let me make sure.  In your

14  argument the explanation your client gave about the documents

15  being at her house or about taking this home was to make some

16  kind of training notebook.

17       MR. SAVIELLO:  Yes, sir.

18       THE COURT:  Is that the explanation you are talking

19  about?

20       MR. SAVIELLO:  Yes, sir.

21       THE COURT:  But then she had this notebook, but admitted

22  she put that together rather recently.

23       MR. SAVIELLO:  Well, certainly, Your Honor.  The

24  evidence when they conducted the search of her house was that

25  notebook had not been created, the documents were there in her

1  house.  The notebook was created for purposes of trial to

2  instructively give an example to the jury how she would have put

3  those documents together had the search not been conducted and

4  the documents seized.  We are not arguing, and I know that comes

5  up in a report and the government's pleadings, and I thought I

6  was perfectly clear during trial that the notebook was not a

7  replica of something that had been done, but rather it was the

8  next logical step for why she had the documents at home, to show

9  they could be organized in a way that would support her

10 document, that it could be organized as a training manual.

11      THE COURT:  Okay.  Well, let's see what the government

12 says.  Government wish to response?

13      MR. GRIMBERG:  Yes, Your Honor.  Good morning, Your

14 Honor.  Stephen Grimberg on behalf of the United States.  Mr.

15 Saviello is correct that it is the District Court's role to make

16 an independent determination of whether the witness -- or the

17 defendant perjured herself by evaluating the demeanor and the

18 behavior that she exhibited on the stand.

19      I don't know that there could be any situation where it

20 is clearer that the defendant perjured herself than in this

21 case, because she was asked a very direct question that went to

22 the ultimate issue in the case, and she was asked that question

23 on three separate occasions, and the question was in various

24 forms, were you providing customer account information to

25 Schnikia Scruggs, and on all three occasions she said absolutely

1    no.

2          There is no way that the jury could have come to the

3    determination that they did that she was guilty of the offenses

4    that she was convicted of if they had believed that testimony.

5    And that testimony cannot be true, when viewed in light of all

6    of the evidence that was presented by the government's case.

7          Mr. Saviello suggests that the only evidence that we

8    presented to counter her negative response to that question was

9    simply Schnikia Scruggs' testimony.  Well, that's not true, Your

10   Honor.  We had phone records showing numerous conversations

11   taking place between her and Ms. Scruggs from the bank on a cell

12   phone that was provided to her for the very purpose of engaging

13   in the scheme.  We have documents found in her house that had

14   the very customer account information that was stolen that was

15   used by Ms. Scruggs.  We have money being deposited in Ms.

16   Scott's bank account from Ms. Scruggs that was the payoff for

17   providing the account information.

18         All of that evidence belies her testimony under oath

19   that she did not provide account information to Ms. Scruggs.

20   The jury simply could not have reached the verdict that they did

21   if they believed her testimony, and anyone sitting in the

22   courtroom that day when she was testifying and evaluating her

23   behavior and her demeanor would have known that she was

24   committing perjury.

25         She perjured on that statement.  She perjured on her

1    explanation for the documents being in her house.  This story

2    that she was putting together a training notebook, it was simply

3    ridiculous, Your Honor.  Some of those documents that were found

4    in her house had been printed at least four months before

5    execution of the warrant.  And they weren't found assembled on

6    her desk or on the kitchen table, as if she was preparing a

7    notebook.  They were found in her closet, in her bedroom closet

8    under her bed.

9         And she suggests there was a coincidence.  It was simply

10   a coincidence that the documents that she had scurried away into

11   her house against bank policy was the account information, the

12   very same account information that was stolen.  Her story was

13   simply ridiculous.

14        And then the third point that she made that was clearly

15   perjurious was the suggestion that the deposit made into her

16   bank account by Schnikia Scruggs was to pay for used furniture

17   that Ms. Scruggs had supposedly purchased from her antique

18   store, yet Ms. Scott could not provide a receipt, she could not

19   explain why the money had been deposited into her son's

20   custodial account and then immediately transferred into her own

21   account, rather than being deposited into the business account

22   that she had created for the business at SunTrust.

23        She simply lied over, and over, and over again, and when

24   evaluating her testimony, she was providing even gratuitous

25   lies.  If you recall, Your Honor, she claimed she did not

1   remember her work phone number, that she did not remember her

2   cell phone number, that she did not remember her home telephone

3   number.  She did not want to admit to anything that was going to

4   link back to her having a relationship with Schnikia Scruggs.

5   Even when I read the phone numbers back to her, okay, let's

6   assume for a moment that on the stand that you are nervous, that

7   you don't remember your home phone number or your cell phone

8   number.  When someone reads the phone number back to you and you

9   still deny that that is the phone number that you had, that

10  clearly shows perjury.

11          She even denied that July and August comes after June,

12  if you remember that.  I was trying to establish a timing and

13  she was denying that July and August came after June.  That was

14  the demeanor she was showing on the stand.

15          As for the cases that are cited by Mr. Saviello, Hasner

16  and McDonald, all these cases stand for is the proposition that

17  it is the District Court's decision.  The Eleventh Circuit says

18  that we cannot sit here looking at a cold record and determine

19  whether or not a witness perjured himself.  That is the District

20  Court's role, the District Court was there, is able to evaluate

21  it, and the Eleventh Circuit simply punts this decision back to

22  the District Court and says we are not going to second guess.

23  That's all these cases say.

24          And I submit to Your Honor that, again, if this witness

25  did not -- is not deserving of the obstruction enhancement,

1  considering what she said, the substance of what she said, and

2  the way in which she said it, I'm not sure anyone would.  Thank

3  you.

4         THE COURT:  Thank you.

5         MR. SAVIELLO:  Your Honor, just briefly.  While I

6  appreciate Mr. Grimberg's recitation of his closing argument, I

7  think we are missing the point that you can't square the

8  holdings in Hasner and McDonald factually with this case and say

9  that Ms. Scott's testimony and the impeachment that the

10  government provided is so much greater than Hasner or McDonald,

11  and, yes, Hasner and McDonald, the Eleventh Circuit said we are

12  not going to overturn the Court's decision.  The District Court

13  is in the best position to judge.  You are the District Court

14  judge.  But you have to look at the facts.  The Eleventh Circuit

15  is not a shy Court of Appeals.  They do not hesitate to reverse

16  District Judges on a regular basis if they think they've made a

17  mistake.

18         THE COURT:  I've noticed.

19         MR. SAVIELLO:  So in this particular case when you look

20  at the facts of this case, Ms. Scott's testimony compared to the

21  impeachment that the government brought against her, compare

22  that to McDonald, for instance, where the defendant testified he

23  only made the introduction under duress of entrapment, and the

24  federal agent who was present and party to the introduction said

25  that is not true, I was there, this is what he said, the federal

1    agent versus Ms. Scruggs.  If you really break it down, that's

2    what we are talking about.  And if a federal agent's credibility

3    directly against McDonald's, the defendant's credibility is not

4    enough under the Eleventh Circuit's view to justify obstruction,

5    then how can Ms. Scruggs be, everything else notwithstanding.

6         And I would point out about the phone records, the

7    government cites that as great authority showing perjury.

8    Again, the phone records are simply records of phone calls.

9    There is no question that Ms. Scott and Ms. Scruggs had a prior

10   relationship in which they would place phone calls to each

11   other.  The substance of those phone calls was not recorded, was

12   not memorialized in any way, so the existence of the phone calls

13   either from work or any other phones doesn't show anything other

14   than the fact that they had a relationship.

15        So noting all of that, Your Honor, you can't -- I don't

16   think that you can square the facts of this case with the

17   holdings and the facts in <u>Hasner</u> and <u>McDonald</u> and justify the

18   obstruction enhancement; notwithstanding that she testified, the

19   jury disbelieved her and convicted her.  They did the same with

20   <u>McDonald</u> and they did same the with <u>Hasner</u>, who testified

21   unequivocally multiple times on the stand, I didn't do it, this

22   is what I did, and it was not perjury.

23        THE COURT:  Well, coming from Superior Court, I kind of

24   believe a person has the right to defend themselves and deny it.

25   It is when it goes beyond that telling their side of it that we

1    get into this obstruction, although I think some of the other

2    judges on the Court probably draw a line a little closer or a

3    little further away from the defendant perhaps than I do.

4          But I guess the problem I have in this case is the

5    documents in her house, this notebook she shows up with at

6    trial, and her position about these deposits and that they were

7    for furniture.  It kind of takes her across the line in my

8    opinion.

9          And I'm sitting here looking at 3C1.1, commentary note,

10   application note 4, particularly 4B and C.  So I'll overrule

11   that objection.

12         Now, the next objection, let me see if I can save you

13   all some time, I find it has more merit.  She has a criminal

14   history, one point for some kind of fighting offense in College

15   Park.  That doesn't really take her out of category number 1,

16   but the fact that she's on some kind of misdemeanor probation,

17   probably to pay a fine and to keep her away from getting

18   involved in anymore fights, although the defendant doesn't

19   appear to be a person that would engage in that kind of conduct.

20   I think the two points that get added for her being on probation

21   for a fray overstates her criminal history, but I'm happy to

22   hear from the government further.

23         MS. HOYT:  Your Honor, beyond what I have said in the

24   sentencing memorandum on this point, I don't have a lot to add,

25   but I would like to just restate briefly, if I could, what I did

1    in the sentencing memorandum, which is that it's the

2    government's position that criminal history category 2, first of

3    all, results from an accurate application of the Sentencing

4    Commission rules.  It does not substantially overstate her

5    criminal history for the reasons that we set forth in our

6    memorandum.  She was arrested for this offense while she was on

7    probation, but I did point out to the Court that while her --

8    she had other arrests than the fighting arrests.

9         THE COURT:  But I can't really count the other arrests,

10   can I?  I mean, I note the other arrests, particularly the

11   deposit account fraud in Henry County.

12        MS. HOYT:  Your Honor, they weren't counted, and, again,

13   that resulted from an accurate application of the Sentencing

14   Guidelines.  But I think this is not a case where up until she

15   got into his altercation she had never done anything in her

16   life.  Within a four-year period from 2003 to 2007, she was

17   charged with four criminal offenses and convicted of those four

18   criminal offenses.  Three out of the four involved dishonesty.

19   One involved fraud on a financial institution, like the instant

20   offense, and so for that reason I think that basically -- The

21   Court's position that it might be a little bit too harsh to

22   assess the extra two points because of the fighting charge, if

23   that was the only thing she had ever done other than the instant

24   offense, I can't say that I would agree with the Court's

25   position, but I think that position would have more merit than

1    it does in this case.  I don't really have anything to add other

2    than to say that in light of all the facts and circumstances, in

3    light of her -- the entirety of her criminal history, and in

4    light of the fact that criminal history category 2 really just

5    results in a three to four month increase over -- in her

6    sentence over criminal history category 1, I don't think it

7    substantially overrepresents her criminal history.  Thank you,

8    Your Honor.

9          THE COURT:  Okay.  Well, I'll make a finding that the

10   two points for -- added, while she was on probation for a fray

11   in Clayton County, overstates her criminal history, so I'll

12   sustain that objection and put her in criminal history category

13   Roman numeral 1.  Are there any other objections I need to

14   consider?

15         MR. SAVIELLO:  There are no other guideline objections,

16   Your Honor.  We have argument regarding 3553 factors and what

17   would be a reasonable sentence.

18         THE COURT:  Well, let's see if I can make a guideline

19   calculation here.  Count 1 carries up to 30 years in

20   confinement, a million dollar fine or both.  Counts 4 and 5, two

21   years consecutive, $250,000 fine as to each count.  Mandatory

22   minimum on Counts 4 and 5 are two years consecutive, $250,000

23   fine.  She has a total offense level of 19.  Criminal history

24   category Roman numeral number 1.  That yields -- let me make

25   sure.  That gives a custody guideline range on Count 1 of 30 to

1    37 months.  Counts 4 and 5, 24 to 48 months, making a guideline

2    range totally of 54 months to -- wait a minute.  Is it 85

3    months?  No.  Yeah.  85 months.  Fine guideline range of 6,000

4    to 60,000.  Restitution in the amount of $125,604.94.  Special

5    assessment of $300.  There is no forfeiture provision.  There is

6    not a probation option.  Supervised release on Count 1,3 to 5

7    years, Counts 4 and 5, 1 year as to each count.  It is noted she

8    is a United States citizen.

9         If there is no further objection, the Court will adopt

10   those as the guideline calculations.  At this time I'll afford

11   the defendant and her attorney an opportunity to be heard in

12   extenuation and mitigation.  The defendant has the right to

13   address the Court personally and she may do so, but I'll let you

14   proceed, Mr. Saviello.

15        MR. SAVIELLO:  Thank you, Your Honor.  I'd like to make

16   my argument first for extenuation and mitigation.  As the Court

17   is aware, Title 18, United States Code, section 3553 gives

18   specific guidance to the Court as to what factors Your Honor

19   ought to consider when determining what a reasonable sentence is

20   in this case.  Notwithstanding the guidelines in this case,

21   there is, of course, a 24-month mandatory minimum on certain

22   counts, but otherwise beyond that 24 months it is solely within

23   Your Honor's purview to determine what is reasonable.

24        And of the factors in 3553, which I find -- I think Your

25   Honor has found to be a good guidepost for how to approach

1    mitigation arguments, I think there are several in Ms. Scott's

2    case that warrant specific attention.

3           First, 3553 suggests, of course, that the sentence not

4    be any greater than necessary to meet the status -- meet the

5    requirements imposed.  The first of those would be the nature

6    and circumstances of the offense.

7           And the only point I would make here, Your Honor, we had

8    a trial in this case.  The facts are abundantly clear.

9    Conviction came down.  Your Honor, we are all familiar with the

10   facts, and I don't think they need significant repeating, but I

11   would point out regarding the nature and circumstances of the

12   offense, and this will come back to the disparity argument I

13   make towards the end of this.  Keep in mind the difference in

14   conduct between Ms. Scruggs and Ms. Scott, the two defendants

15   remaining in this case not given pretrial diversion as Mr.

16   Monroe was.  And I would just point out again, and I'll do so in

17   a little more detail later, that Ms. Scott's conduct I would

18   argue is significantly lesser than Ms. Scruggs' conduct, and

19   that is Ms. Scruggs crafted the scheme, Ms. Scruggs benefitted

20   almost exclusively from the scheme, and Ms. Scruggs exercised

21   incredible creativity and drive in her -- the manner and means

22   in which she found to drain these bank accounts through PayPal

23   and through other methods.  I would just like you to consider

24   that in the context in which we look at some of these other

25   factors.

1        Moving on to history and characteristics of the

2   defendant, we just spoke about this with the overrepresentation

3   of criminal history.  But for several minor brushes with the

4   law, Ms. Scott has otherwise been generally a law-abiding

5   citizen.  She had a bad check charge.  I disagree with the

6   government's contention that she had four prior convictions, but

7   rather there were three between 2003 and 2007.  But the

8   presentence report speaks specifically to that, which Your Honor

9   has already adopted.

10       Moreover, Your Honor, regarding Ms. Scott, she began

11  working when she was 13 years old, a fairly young age, but

12  helping to provide for her family.  She continued to work some

13  over the next few years during school, but after the age of 19,

14  Your Honor, Ms. Scott worked continuously.  Her Social Security

15  records indicate lawful, legal gainful employment from the age

16  of 19 up until she was arrested in 2007 for this offense

17  conduct, when she's been unable to get gainful employment since

18  then, pending State Indictment and pending Federal Indictment

19  investigation.

20       I think it is noteworthy that she has had such a solid

21  work history, when in this court so often we don't have that to

22  view, and I think that's an indication of the characteristics of

23  Ms. Scott that suggests a lower sentence is appropriate.

24       Moreover, Your Honor, Ms. Scott has two children.  She

25  has an 8-year-old son, which she is the primary caregiver.  The

1   child's father is not particularly involved in his upbringing.

2   She also has a four-month-old daughter.  Your Honor is aware she

3   gave birth just very shortly before trial in this case.

4   Obviously, her four-month-old daughter is at an incredibly

5   tender age for her mother to be taken away from her, Your Honor.

6   So we would ask you to consider that as one of the

7   characteristics of the defendant when thinking about a

8   reasonable sentence.

9        Next, 3553 suggests that Your Honor consider the need

10  for the sentence to afford adequate deterrence.  And, of course,

11  the degree and severity of the sentence imposed in a criminal

12  case ought naturally to depend upon the susceptibility of the

13  defendant to the deterrent message imposed by the Court, when

14  you consider deterrence as an appropriate factor for determining

15  what the sentence ought to be.

16       And I would argue in this particular case, Ms. Scott's

17  conduct while on pretrial release has been exemplary, and I

18  would note she was arrested and made bond in the state court in

19  2007.  So she was on one form or another of pretrial release for

20  almost three full years without any violations of the terms of

21  her pretrial release, without any indication that there was any

22  problems, that she was up to no good in any way, shape, or form,

23  and that's an extraordinary long time to be under investigation

24  and Indictment and under supervision, and I believe that her

25  conduct during those three years is, in fact, an accurate

1    picture of what Your Honor could expect from Ms. Scott's

2    approach to this case and her respect for the justice system,

3    and her willingness to do what is required from her on pretrial

4    release, even while disagreeing with the charges, and

5    disagreeing with the testimony against her, and disagreeing, in

6    fact, with her conviction, Ms. Scott continued to follow the

7    rules as imposed by the Court showing her respect for the

8    system.

9         So when considering deterrence, I think the facts are

10   clear Ms. Scott understands the seriousness of the case,

11   understands what it means to be convicted and to have a

12   sentence, and the sentence ought to not be increased for greater

13   deterrence purposes.

14        Next, the need to protect the public from further crimes

15   of the defendant.  Just very briefly, considering there is a

16   two-year mandatory minimum in this case and her work history and

17   personal history, I don't think any greater sentence is needed

18   to protect the public from any future crimes of Ms. Scott.

19        Finally, Your Honor, the need to avoid unwanted

20   sentencing disparities among defendants similarly situated.  And

21   this is where I would argue that Your Honor should pay close

22   attention, and put some significant focus, and that is that Ms.

23   Scruggs concocted and conducted this scheme pretty much from

24   start to end.  If the evidence is believed that the source of

25   some of the information came from Ms. Scott, the evidence is

1   also abundantly clear from multiple sources, including records

2   that Ms. Scruggs profited almost exclusively from this scheme,

3   and, again, she controlled the flow of information, she

4   controlled what she did with the information, she controlled how

5   she disseminated that information to others, and coached others

6   how to drain those bank accounts.  None of that done by Ms.

7   Scott.

8         So considering Ms. Scruggs and Ms. Scott, I think it is

9   fair to say Ms. Scruggs is much more culpable, certainly much

10  more involved in the scheme.  And then we look at Ms. Scruggs'

11  criminal history, which the Court remembers, goes far, far back.

12  All it fraud conduct, Your Honor, in varying forms, increasing

13  in complexity in the nature of the years she became more

14  accomplished, or believed she was becoming more accomplished.

15        Nevertheless, compared to Ms. Scott, a significant

16  difference.  Bringing me then to the sentence that Ms. Scruggs

17  received in this case of 40 months, credit for the 22 months she

18  did in state custody, resulting in that federal custodial

19  sentence of 18 more months to do, and I would just ask Your

20  Honor to consider that when considering what an appropriate

21  sentence for Ms. Scott is.

22        Yes, Ms. Scott went to trial.  Yes, she lost at trial

23  and the jury found her guilty.  Nevertheless, exercising your

24  constitutional right to trial ought not to increase your

25  punishment significantly.  And 3553 specifically grants the

1  Court, orders the Court to consider disparate sentences between

2  similarly-situated defendants.  And in this case we would argue

3  Ms. Scruggs was much more involved, profited much more greatly,

4  and, in fact, has been an fraudster for her entire adult life,

5  and Ms. Scott's sentence as someone who did not profit greatly,

6  was much less involved in the scheme than Ms. Scruggs, does not

7  have a prior fraud history even approaching Ms. Scruggs, ought

8  to have a similarly lower sentence.  If the guidelines are to be

9  followed, Your Honor, and there is no adjustment from those,

10  then Ms. Scott's sentence would be higher than Ms. Scruggs, and

11  we think that is a disparity that Your Honor ought to not let

12  occur.

13        THE COURT:  Well, but the real disparity, there is some

14  disparity, I'll agree with you.  It causes me some concern, but

15  had she not gone to trial and got the three points for

16  acceptance of responsibility and had not gotten the two points

17  for obstruction, she would be about the same level as Ms.

18  Scruggs.  Ms. Scruggs is just ahead of her from 22 months of

19  being in confinement.  Ms. Scruggs had a greater criminal

20  history category than your client, wouldn't be too far from zone

21  C.  However, your client was the one that worked for Wachovia

22  and violated the trust of an employer in the matter.

23        MR. SAVIELLO:  I point out that Ms. Scruggs, of course,

24  went to the Barker's house as a notary to obtain their personal

25  information, invited into their home, gave her personal

1  information, and took advantage of that, and testified she had

2  done that a number times, and, in fact, maintained personal

3  identifying information from her job, such as it is, as a notary

4  on many other occasions, so in terms of violating personal

5  trust, a professional coming in to witness your signature into

6  your own personal home, I would argue violates the trust in an

7  equal way.

8       THE COURT:  If you can't trust a notary, who can you

9  trust?  Is that the argument?

10       MR. SAVIELLO:  Absolutely, Your Honor.  That's why

11  notaries exist.

12       THE COURT:  They are certified to have good character.

13       MR. SAVIELLO:  Exactly right.  They exist for one

14  purpose and that is to transfer their credibility to the

15  document they are notarizing.  So I would argue then that if

16  Your Honor is concerned about the violation of personal trust,

17  Ms. Scruggs is in a position of greater violation of personal

18  trust, going into people's homes.

19       THE COURT:  Well, your argument has a lot of appeal.

20       MR. SAVIELLO:  I'll sit down now, Judge.

21       THE COURT:  All right.  Let's see what the government

22  says, see if they agree.

23       MS. HOYT:  Your Honor, the Court asked Mr. Saviello if

24  you can't trust a notary, who can you trust?  And I would ask,

25  if you can't trust someone who works in the fraud detection

 1    department of your bank, who can you trust to protect your

 2    accounts?  To say that Yolanda Scott was less involved in this

 3    offense than Schnikia Scruggs just is completely inconsistent

 4    with the facts in this case.

 5         Yolanda Scott, as Meg Stitt testified, had the keys to

 6    the kingdom.  Schnikia Scruggs could not have done what she did,

 7    she could not have defrauded these customers without Yolanda

 8    Scott's help.  Yolanda Scott was her source for the bank account

 9    numbers that she got, including the bank account numbers of Cora

10    Barker's children, because the only information that she had

11    going in was Cora Barker's name and Cora Barker's Social

12    Security number.  She got those children's bank accounts from

13    Ms. Scott.

14         One of the people that she was charged with protecting

15    was Deena Scott, the victim in this case, and I hope that the

16    Court got a letter that --

17         THE COURT:  I did.  I haven't mentioned that for the

18    record, but you have forwarded me a letter from Deena Scott,

19    which I have.

20         MS. HOYT:  I'm sorry.  I didn't mean to interrupt.

21         THE COURT:  I have, and your letter is dated August

22    20th.  I have read that.

23         MS. HOYT:  And I would -- the government would like to

24    enter this letter from Ms. Scott into the record as a government

25    exhibit in the sentencing.  Ms. Scott very much wanted to be

1    here, and I think that her letter goes right to the heart of the

2    issue of the Court needing to craft a sentence that is adequate

3    to punish this kind of crime.

4         She talks about -- she -- in the letter, Ms. Scott

5    thanks the government for what it does to try to help people who

6    have had their identities stolen.  She talks about how violated

7    and vulnerable it made her feel in 2006 to realize that her

8    money market account had been plundered.  She was at that time

9    caring for her sick and disabled mother, for whom she is still

10   caring.  That's why she couldn't be here today.  She was going

11   through a divorce, and she gets home one day and opens her money

12   market account to find out that it's been plundered.  She talks

13   about the length of time that it took her and the visits to the

14   bank that she had to make to prove that these were unauthorized

15   transactions, because, of course, that is something that anybody

16   would have to do.  You can't just go into the bank and say, hey,

17   you know what?  Ten thousand dollars is gone from my account.

18   It wasn't me.  Let me have ten thousand dollars.  It takes a

19   long time, and we heard that from witness after witness in this

20   case.  It takes a long time, it takes a lot of paperwork.  The

21   bank has to make sure that it's not being flim-flammed by

22   someone who is being dishonest when they say that their money

23   has been stolen.  All of that time, that individual, that

24   person, somebody like Ms. Scott who is going through a divorce,

25   who has a disabled mother to take care of, has to take that time

1    out of her life and go straighten things out to the bank.

2         She talks about her ongoing discomfort since this

3    incident and her uneasiness any time she has to disclose

4    anything like her Social Security number, and she basically says

5    something needs to be done to deter criminals from doing this.

6         And, Your Honor, the government would posit in this case

7    the guideline sentence with the consecutive mandatory minimum is

8    exactly what it takes to deter crime like this.  As I said, and

9    I keep coming back to it, but I think it is particularly

10   egregious that Ms. Scott -- that the job she was charged with

11   was to protect bank customers from crime.  She wasn't a

12   secretary.  She wasn't a teller.  She was someone who was

13   supposed to in her day-to-day work protect customers from fraud.

14   Instead, she was taking their documents home and selling the

15   information.

16        With regard to the history and characteristics of the

17   defendant, Your Honor, and the government pointed this out in

18   its memorandum, I think the history and characteristics of the

19   defendant mitigate in favor of this sentence that the government

20   is asking the Court to impose in this case.  Ms. Scott is, as

21   her testimony at trial demonstrated, an intelligent and

22   articulate person.  She had a long-time career in the banking

23   system.  She was capable of earning an honest living.  She is a

24   clever person, who on top of her stated job with the bank, went

25   out and formed her own business, set up a checking account for

1    it.  She is a person who was capable of earning an honest living

2    and instead of doing that, she decided to try to supplement her

3    income with this kind of fraudulent activity.

4         And I would like to address for the Court something that

5    we also addressed in our sentencing memo and provided to the

6    Court.  Subsequent to -- and really just a few weeks ago, the

7    United States Attorney's Office was contacted by a fraud

8    investigator at Home Depot.  Ms. Scott contacted Home Depot and

9    made unsubstantiated allegations that Schnikia Scruggs was

10   stealing from Home Depot.  She copied a WSB-TV news reporter

11   with this e-mail that she sent to Home Depot.  Home Depot

12   contacted us after their fraud investigators did research and

13   learned Ms. Scott and Ms. Scruggs had been charged as

14   co-defendants in this crime.  And once they learned that Ms.

15   Scruggs -- Ms. Scott had been convicted and Ms. Scruggs had

16   testified at trial, they decided not to go forward with their

17   investigation, the reason being pretty clear that these were

18   unsubstantiated allegations by someone who was angry at someone

19   who had testified against her.  And I just submit to the Court

20   that that is just additional evidence of Ms. Scott's complete

21   lack of acceptance of responsibility.  I'm not talking about

22   Sentencing Guidelines acceptance of responsibility, I'm talking

23   about acceptance of responsibility for what she has done, for

24   what there was clear evidence of.

25        I think that her testimony, the Court has already found

1    that it was obstructionist.  As Mr. Grimberg very eloquently

2    argued, it was totally -- it just was completely incredible, and

3    now she compounds it by going out and trying to make trouble for

4    witnesses in the case by making allegations, that if she had

5    anything to substantiate them, there was nothing about it in the

6    e-mail, and I think that is something that the Court should also

7    consider as evidence of Ms. Scott's character, and of, you know,

8    how much she has learned her lesson in this case.

9         I would like to address for the Court the argument that

10   Mr. Saviello made about the unwarranted disparity in the

11   sentencing between Ms. Scott and Ms. Scruggs.  As the Court

12   pointed out, first of all, Ms. Scruggs received credit for

13   acceptance of responsibility.  She did not receive an

14   obstruction enhancement.  And, Your Honor, I want to make

15   something clear, and that is that the government is not

16   defending anything that Schnikia Scruggs did.  We are not doing

17   that at all.  But the fact of the matter is that from the time

18   she was arrested on the underlying charges in Forsyth County,

19   she said to Deputy Nichols when he arrived, I know why you are

20   here and I'm going to tell you what I have done.  She said that

21   when she answered the door.

22        And I can state in my place, Your Honor, that I listened

23   to several hours of a recorded statement that Ms. Scruggs made

24   in Forsyth County.  I have been through several proffers with

25   her, and her statements have been consistent, and essentially

1   they fully disclosed her dishonest conduct, and her part in this

2   crime, and they just remained consistent throughout several

3   proffer stories.

4        She also disclosed misconduct that she was guilty of

5   that we would not otherwise have known about and that we in turn

6   disclosed to Mr. Saviello pursuant to our obligations under

7   Giglio.  She told us some things that we disclosed under Giglio,

8   that truly, we would have no way of finding out.  She could have

9   made herself look better than she was.  She also -- She could

10  have, you know, tried to put more responsibility on Ms. Scott

11  than she did.  Ms. Scruggs never did that.

12       She also, because of the information she gave us post

13  Indictment about Germaine Monroe, and the paper trail in this

14  case made it appear that Germaine Monroe was an active

15  participant in this case, but based on the information Ms.

16  Scruggs gave us in her proffer, we learned that was not true,

17  and I want to note for the Court that that was the first thing

18  she wanted to tell us, before she told us anything that was

19  involved with testifying against Ms. Scott or moving the

20  prosecution forward, she wanted us to know, I really think you

21  have indicted the wrong person, and here is why, and as a result

22  of the information that we obtained and were able to confirm, we

23  were able to put Ms. Monroe in pretrial diversion.  So Ms.

24  Scruggs also in my view prevented an injustice from being done

25  as to Ms. Monroe.

1          Finally, she testified at trial.  Essentially, the

2     40-month sentence she received, because the Court gave her

3     credit for the 22 months she already served in Forsyth County,

4     was reasonable in light of everything she did, in light of her

5     cooperation, and in light of the guidelines, and I would like

6     for the Court to consider the case of United States versus Del

7     Campo.

8          THE COURT:  Del Campo?

9          MS. HOYT:  Del Campo, Your Honor.  It's an Eleventh

10    Circuit case.  And I have flagged the language that I would like

11    you to consider.  It is at page -- I believe it's at page 1101

12    of the Court's decision.  The Eleventh Circuit states as

13    follows:  Defendants who cooperate with the government and enter

14    a written plea agreement are not similarly situated to a

15    defendant who provides no assistance to the government and

16    proceeds to trial.  There is no unwarranted disparity even when

17    the sentence the cooperating defendant receives is substantially

18    shorter.  It would seem patently unreasonable to endorse a

19    regime in which a defendant could steadfastly withhold

20    cooperation from the authorities and then cry foul when a

21    co-conspirator benefits from its substantial assistance to the

22    government.  Because the defendant did not provide any

23    assistance to the government, there was no unwarranted disparity

24    between his and his co-defendant's sentences.  And I would

25    submit to the Court that there is no such unwarranted disparity

1    in this case.

2         Your Honor, if I could just take a moment.  With regard

3    to the need for deterrence, and I address -- the government

4    addressed this in its memorandum, but as the government pointed

5    out in its memorandum, fortunately, because of the termination

6    of her employment with Wachovia Bank and her conviction in this

7    case, Ms. Scott is unlikely to be employed by a bank or other

8    financial institution in the future, and that would preclude her

9    ability to engage in a crime that is very similar to this one.

10        But there is simply -- her complete lack of any showing

11   of remorse or any pangs of conscience about this case suggests

12   to the government that absent a significant sentence for the

13   crime she committed, she is not likely to be deterred from any

14   other type of fraudulent or criminal conduct in the future.

15        We address the issues about the need for deterring

16   others who are in similar positions from this type of crime, and

17   there clearly is that need in this case.

18        Your Honor, so for these reasons the government would

19   submit that a reasonable sentence is a guideline sentence

20   followed by the consecutive minimum mandatory sentence for

21   aggravated identity theft.

22        THE COURT:  All right.  I think we may have gotten out

23   of order a little bit, Mr. Saviello.  Does your client wish to

24   address the Court?

25        MR. SAVIELLO:  Your Honor, first, one brief response to

1    the government's argument and then Ms. Scott's mother would like

2    to be heard, and then her fiance, Mr. Adams, would like to be

3    heard, and Ms. Scott is reserving the right.  She's a little

4    nervous.  I would point out about the Home Depot issue, that is

5    Ms. Scott giving information to Home Depot suggesting Ms.

6    Scruggs was defrauding Home Depot.  I would argue that is not

7    unsubstantiated, and in fact days before trial we learned Ms.

8    Scruggs had used Ms. Barker, used her name, Social Security

9    number and forged her signature on a credit card application at

10   Home Depot where Ms. Scruggs was the primary person, Ms. Barker

11   was the secondary person.  Ms. Scruggs' intent was to get that

12   credit account, charge it up, not pay it, and then the problem

13   to pay that would then fall on Ms. Barker.  We learned that

14   shortly before trial, so we would argue the comments Ms. Scott

15   directed to Home Depot about Ms. Scruggs are, in fact,

16   substantiated, that Ms. Scruggs actively and intended to pursue

17   Home Depot.  Ms. Scott's mother, Ms. Crispin Williams, would

18   like to be heard briefly, Your Honor.

19          THE COURT:  That will be fine.  It always speaks well

20   for the family to be here.  Tell me your name.

21          MS. WILLIAMS:  I'm Pastor Diane Williams.

22          THE COURT:  All right.  And what do you need to tell me

23   about your daughter?

24          MS. WILLIAMS:  I want to say this.  I came to Atlanta

25   over thirty years ago, and when I came to Atlanta, I had eight

1   children.  I didn't bring my eight children up here to get

2   killed or be put in circumstances like this.  I tried the best

3   to my knowledge as a single parent to raise my children.

4         THE COURT:  You came from Seminole County?

5         MS. WILLIAMS:  Yes, sir, where you work on the farms,

6   you work very hard.  I'm the grandmother of over 40 grand kids.

7   I have over 40, counting some that are being birthed now as we

8   speak, and I have over 6 great grand kids.  The things that they

9   are accusing Yolanda of, she didn't do it.  She didn't do it and

10  I can prove it.  She didn't do it.  When they say they searched

11  her closet, they didn't find a gun in there.  There was a gun

12  there.  The papers that she was putting together were on her

13  bed.  I know, because I came here to help my child.  The

14  businesses that Yolanda started up, they saying she was very

15  intelligent, I started those businesses to help my children.  I

16  always wanted them to have.  We worked -- these kids worked very

17  hard.  We worked in the CNN Center with Ted Turner.  We worked

18  in the health clubs.  I worked.  We worked.  Those kids, little

19  kids, went to work with me daily to teach them the right way,

20  not to do things that are wrong.

21        And other things, just like the juror going to sleep.

22  How can you judge somebody when you are asleep?  My God, this is

23  devastating, this child.  And the check.  I wrote the check, and

24  we tried to get that cleared up.  I wrote that check.  I did it.

25  We had the monies in the bank for it, but I wrote the check and

1  the guy, he just was mean, he just wanted to do that.  I'm

2  telling you this stuff.  And, oh, let me get down to it.

3  Trustworthy.  Trusting somebody.  I took Schnikia under my wing,

4  just as I did this boy, raised him a professional football

5  player.  Schnikia came to me years ago, many years ago, and she

6  told me that she wanted to commit suicide because of the things

7  that she was doing, that her mother had her doing.  There was an

8  old lady they had mistreated and took all of her credit cards,

9  stole all of her money.  She died.  Schnikia went through a lot

10  of stuff and one of my daughters helped Schnikia.  She had been

11  out of the picture many years because they had scared me out of

12  seven thousand dollars on a condo.  And I asked my children to

13  stay away from her, don't even be around her.

14      And when I found out that my daughter was talking back

15  to Schnikia, Schnikia had came to my daughter for help.  She

16  said she couldn't get to her job, and my daughter had a BMW.

17  She let her use the car, and Schnikia tore up the car.  And

18  after all of that they had some words, and because of that, she

19  violent.  Schnikia had been -- This child would give the shirt

20  off her back.  Even with that fight, she took the blame on her

21  because of my granddaughter was fighting the daughter-in-law.

22  Schnikia has been in my home.  She has been in these children's

23  home.  She has free access.  She knows me.  They always call me

24  momma.  She has free access to go all through the house, to live

25  there, to do anything she wanted to do.  Schnikia is no child in

1   this.  Schnikia been doing this many, many years.  I have gotten

2   on her many times about doing that evil stuff.  She's a pro.  My

3   God, like I said, if something don't be done about her, she is

4   going to get out in a few months, my God, God forbid what she

5   will do next.  Her mother is the same way.  Her mother does this

6   stuff.  The aunts, all of them do it.  And they think it's

7   funny.  It's not funny to destroy somebody's life.  You don't

8   take a child -- this child wanted to be a judge.  She went to

9   law school.  I couldn't afford to send her to Clayton State,

10  where she went.  Then we tried to put her in Griffin and I

11  couldn't continue to pay it because I lost my job.

12          And when I did, she -- always, all throughout her life,

13  and I don't want anybody to sympathize with me.  Do not pity me.

14  Only God can have mercy on me.  But my children, but she wanted

15  to become a judge, and she still, no matter what happens out of

16  this circumstance, she still going to be a judge.  She is going

17  to be a judge.  Judge Hatchett is one of my dear friends.  She

18  is going to be a judge.  And I just wanted to speak to you to

19  tell you the things she is accused of here, she didn't do it.

20  She didn't do it.  She loved her job, even to the point if she

21  wanted to steal something from a bank, over in Fayetteville, she

22  worked at that bank.  There were times when she had to go in

23  that bank and open the door and run it by herself because the

24  employees didn't show up.  She had access to the vault.  She had

25  access to anything in there.  She didn't do it.  She loved her

1    job.  She wouldn't do it.  Thank you all so much for hearing me.

2    Thank you.

3              THE COURT:  Thank you.

4              MR. SAVIELLO:  Your Honor, Keith Adams would like to

5    have a few words as well.

6              THE COURT:  That will be fine.  All right.  Tell me your

7    name and how are you related to the defendant.

8              MR. ADAMS:  My name is Keith Adams and this is my

9    fiance'.

10             THE COURT:  Okay.

11             MR. ADAMS:  And I'm a professional football player.  I

12   have known Yolanda since I was nine.  She isn't the type of

13   person they are trying to portray her to be.  I was married

14   before.  My wife divorced me, took everything that I had.  This

15   girl brought me in and she made me the person I am now.  Now I

16   have a contract on the table with the New England Patriots.  I

17   mean, we are starting a family together.  This person, she's not

18   a thief.  She's not anything like that.  She got me saved back

19   into the Lord.  This person works hard for Jesus.  Jesus is her

20   King.  That is her Savior.  We go to church every Sunday, every

21   Wednesday.  She stands up for what is right.  She's been going

22   through this three years, Your Honor, three years.  And I know

23   without a shadow of a doubt I would lay my life down for her,

24   like Jesus laid his life down for the church.  That's the only

25   thing I have to say.

1          MR. SAVIELLO:  Ms. Scott wants to be heard.

2          THE DEFENDANT:  Your Honor, I want to speak.  I felt

3   like it was only right that I speak today.  I honestly took

4   those papers home to make a notebook for a training notebook.

5   That's why they keep saying the documents, the documents.  Your

6   Honor, it was over a hundred some pages as to what they are

7   saying.  The documents, if you look at all the documents, you'll

8   see there is training material in there.  That's all it tells

9   you is how to do the transaction, how to be more effective at

10  what you are doing.  I was trying to be more accurate, because

11  at the time when I took these documents home and when we was

12  going through a process at Wachovia, they was getting ready to

13  send our company overseas, and when they were sending the

14  company overseas, they were bringing the people in.  My manager

15  came to us and told us, she said, whatever you got to do to

16  become more effective, if you are not an effective one, they are

17  going to eliminate your job.  You are going to be gone.  So she

18  said whatever you have to do, do it, but, of course, she's not

19  going to come here in front of you guys and testify she said

20  that, because under our company, she is just going to say she

21  has to go by the rules, she can only go by what Wachovia tells

22  her to go by.  She can't just say, okay, I told them if they do

23  something, you know, don't say nothing, it's okay.  She can't

24  say that.  She's a manager.

25          But at the same time when I took these documents home,

1   all I was trying to do was become more effective at my job, so

2   they would eliminate each department, we had a review side, and

3   we had another side that does it, reviewing other materials, and

4   what they had did, they had just sent one side of the room over,

5   and they had got rid of their jobs and sent them overseas

6   already.  They had got it down to only my department.  We was

7   the last department left.  They were trying to see what they

8   were going to do, whether they were going to eliminate it or

9   whether they were going to keep it.

10          So my thing was Colleen Britton sat right behind me,

11   Your Honor.  That's where I copied the documents from her, as

12   you have seen, we showed you that in court, and when I copied

13   the documents, she said it's okay if you take them home, put a

14   notebook together, just bring it back.  When they came to my

15   home, Your Honor, there were not documents all over my home.

16   They were only in my master bedroom.  I was getting myself

17   prepared to go back to work and have this folded together.  My

18   mother came to my house to get my car so she could pay a bill or

19   something for me, and I was in the process of getting myself

20   together for the week and getting my three-year-old son

21   together.  When I was going through all of this stuff, Your

22   Honor, I understand it's like day one, when the government

23   arrested me and stuff, they wanted me to talk and cooperate with

24   them.  I was going through so much myself.  My son's father

25   walked out and left me by myself.  I was helping my sister, whom

1   Schnikia was friends with, and that's how Schnikia even got into

2   my home, because of my sister.  They were friends.  I didn't

3   know she would do this type of stuff.  This is somebody that ate

4   at my house, we laughed, talked together.  I had no idea that

5   this person would steal from me and do something like this.  I

6   didn't know she would do this.  So when it came up and they

7   arrested me, I was at a loss.  I was at a loss.  I didn't know

8   what to think.  They just -- I had all of these people coming at

9   me, saying all of this stuff.  I'm just saying, Lord, I'm

10  already in a bad situation, and now here is somebody that came

11  and made it worse for me.  I didn't know what to do.  And they

12  just kept telling me, talk to us, talk to us, calling me and

13  stuff.  I'm saying, Lord, why these people can't see that I'm

14  not trying to do that.  Lord, if I was going to do that, Your

15  Honor, I worked with the bank all of these years, and I did open

16  the bank by myself.  Even my manager came.  There is nothing bad

17  she had to say about me, because I was trying to just do my job

18  the best I knew how to do it.  I wasn't there trying to take

19  anything from anybody.  I didn't want anything from anybody.

20  That's not what I was trying to do.

21        And then they said about the deposit into my account.

22  Your Honor, why would I have her go to Wachovia where I work,

23  not the branch, but why would you go to a place of my employment

24  to do fraud?  Why would I have you to come right to my job to do

25  fraud?  That doesn't make any sense.  And then like so many

1    loopholes and laws in this case, Your Honor, there is so much

2    that it seems like they just decided since she told them me, she

3    knew that was a cover-up to just -- because she knew I worked at

4    the bank, she told you she asked my sister where I was employed

5    and stuff and them having a discussion.  She found her perfect

6    opportunity to come in and do what she did.  She stole from me.

7    She stole from these people.  This is all she does is steal,

8    steal all the time, Your Honor.

9          I mean, I have to say my mercy is upon you, because, I

10   mean, I have got to do what I have got to do.  I'm always trying

11   to help somebody.  The stuff on my record is there because I was

12   trying to help people.  Helping people.  That's why I'm in the

13   predicament where I am at now.  When you see my record and when

14   you say, you know, look what she did.  This is not something

15   that I did.  And I keep telling them that I did not do this.  If

16   they would have just looked further, they would see I did not do

17   this.  I was not trying to help nobody steal nobody's money or

18   anything, Your Honor.  Why would I do that?  I have a

19   three-year-old son.  I lost everything I had, my home, my car,

20   everything.  I have got nothing.  I have had to move in with my

21   mother.  I had to move in with my mother.  You know, it's hard.

22   It's been hard for me.  All of this time I have had to look at

23   my child, and my child say to me, you know, when he say to me,

24   momma, you know, I'm hungry, you know.  You know what it is like

25   to have your child look at you and tell you they are hungry and

1  me, after working all of my life, doing everything for myself,

2  not asking people to help me?  I'm used to working and doing my

3  own.  I had to go and ask the government for assistance, you

4  know, to feed my child, to keep her from looking me in the eye

5  saying I'm hungry, because somebody put us in this situation.

6  I'm with my mom, I have to ask my mom, you know, mom, can you

7  take me here, do this for me.  Of course, I know she is free

8  hearted, but people get tired.  I can only do -- She can only do

9  so much for me.  My kids is all I have.  This is all we have.

10  I'm still trying to be here from scratch, and I can't move on

11  because of this case, and I can't give them anything that kids

12  really should have, because I have got this standing in my way.

13  This is making me where I can't get a job and provide for them.

14  I have to just make -- I mean, it's like, only thing I can think

15  of in my mind is I say love.  All I can give them right now is

16  love, so I try to love them to the best of my ability, and make

17  sure I'm a good parent to them so that they can say, at least,

18  my momma didn't give me material stuff, but she did love me.

19  That's all I have left.  That's all I have.  I have nothing else

20  left.  There is nothing.

21      THE COURT:  All right.  Thank you.

22      THE DEFENDANT:  You are welcome.

23      MR. SAVIELLO:  Nothing else, Your Honor.  Thank you.

24      THE COURT:  Okay.  Well, pursuant to the Sentencing

25  Reform Act of 1984 it's the judgment of the Court that the

1    defendant, Yolanda Scott, is hereby committed to the custody of

2    the Bureau of Prisons to be imprisoned for a term of 30 months

3    as to Count 1, 24 months as to each of Counts 4 and 5, to be

4    served concurrently with each other and consecutive to Count 1,

5    for a total imprisonment of 54 months.  It's further ordered the

6    defendant shall pay the United States a special assessment of

7    $200 that will be due immediately.

8            The Court finds that the defendant does not have the

9    ability to pay a fine and cost of incarceration, so that is

10   waived.  It's further ordered that the defendant make

11   restitution in the amount of $125,604.94 to Wachovia Bank,

12   Norcross, Georgia.  Restitution shall be paid in full

13   immediately.  The defendant shall make payments from any wages

14   she may earn in prison in accordance with her financial

15   responsibility program.  Any portion of the restitution not paid

16   in full at the time of release from imprisonment shall become a

17   condition of supervision and paid at a monthly rate of at least

18   $150 or 25 percent of her gross income in excess of two thousand

19   per month.

20           Next, the defendant shall notify the U.S. Attorney of

21   the district within 30 days of change of any mailing or resident

22   address that occurs while the restitution remains unpaid.  Upon

23   release from imprisonment she shall be placed on supervised

24   release for a term of 5 years on Count 1, and 1 year as to each

25   of Counts 4 and 5 to be served concurrently, giving a total

1    supervised release of 5 years.

2            Within 72 hours of her release from the Bureau of

3    Prisons she shall report to the probation officer to whom she's

4    assigned.  While on supervised release she shall not commit

5    another federal, state or local crime, comply with the standard

6    conditions that have been adopted by the Court, and these

7    additional conditions:  1.  She shall submit to one drug

8    urinalysis within 15 days after being placed on supervision and

9    two tests thereafter.  2.  She shall cooperate in the mandatory

10   DNA testing as directed by the probation officer.  3.  She shall

11   not illegally possess any kind of controlled substance.  4.  She

12   shall make full disclosure of her finances and submit to an

13   audit of any financial documents at the request of the probation

14   officer.  5.  She shall pay any financial penalty that is

15   imposed by the judgment and remains unpaid at the commencement

16   of her term of supervised release at the monthly rate of $150 or

17   25 percent of any gross monthly income in excess of two

18   thousand.  6.  She shall not incur new credit charges or open

19   additional lines of credit without approval of the probation

20   officer.  7.  She shall not own, possess or have under her

21   control any firearm, dangerous weapon or other destructive

22   device.  And 8.  She shall submit to a search of her person or

23   property at any reasonable time at the request of the probation

24   officer.  Ms. Scott, do you understand the sentence?  Let me ask

25   the probation officer.  The special assessment is 200 or 300?

1        PROBATION OFFICER:  It should be 300.

2        THE COURT:  Well, let me correct the sentence.  The

3   special assessment that's ordered is 300 rather than 200.  Ms.

4   Scott, do you understand the sentence?

5        THE DEFENDANT:  Yes, Your Honor.

6        THE COURT:  Well, the Court sets the sentence in

7   accordance with the guidelines at the low end of the guideline

8   range, taking into consideration the various factors of 18 USC

9   3553(A), particularly the factor that she violated a condition

10  of trust as an employee in this theft.  It's very hard to say

11  that if I had been on Superior Court she would have received a

12  greater sentence, because the sentence becomes erratic with

13  employee thefts with the desires of the victims sometimes, but

14  this amount of money and violating the condition of trust of an

15  employer warrants this type sentence in the Court's opinion.

16       Is there any objection by either side other than those

17  previously stated for the record to the ultimate findings of the

18  Court, the guideline calculations to the sentence, or the manner

19  in which it's been pronounced?  On behalf of the government?

20       MS. HOYT:  Your Honor, if I could, I apologize.  I

21  failed to remember to bring this up to the Court earlier.  The

22  Court will recall that when Ms. Scruggs was sentenced, the

23  restitution amount was reduced to $94,104.94.

24       THE COURT:  I noticed that, because I reviewed her

25  presentence today.  Is that applicable to this case too?

1       MS. HOYT:  It is, Your Honor.  The loss amount for

2   sentencing purposes is the one hundred twenty-five thousand

3   dollar figure that's indicated in the report, but some of the

4   transfers were reversed, and so that's how we arrived at the

5   lower restitution.

6       THE COURT:  Give me that figure again.

7       MS. HOYT:  $91,104.94.

8       THE COURT:  All right.

9       MS. HOYT:  And I would also ask the Court that if it

10  pleases that the sentence reflect that amount is owed jointly

11  and severally with Ms. Scruggs.

12      THE COURT:  Right.  And any other defendant that might

13  be under a similar order.  Let me amend what I said to change

14  the restitution to $91,104.94 and that restitution is jointly

15  and severally with Ms. Scruggs and any other defendant that may

16  stand convicted in the case, or for some other reason contribute

17  to the restitution.  All right.  Is there any objection on

18  behalf of the defendant?

19      MR. SAVIELLO:  Your Honor, we just renew our objections

20  we made at trial and objections to the guidelines that were not

21  sustained by Your Honor.

22      THE COURT:  Okay.

23      MR. SAVIELLO:  Otherwise no other objections.  I do have

24  a couple --

25      THE COURT:  Wait a minute, just a minute, before we move

1    to the next item.  If there are no other objections, the Court

2    will note those for the record and let you preserve them.  Let

3    me advise the defendant she has the right to appeal.  Of course,

4    she went to trial in this case so she has the right to appeal

5    her conviction and her sentence, and if she's unable to pay the

6    cost of an appeal she may apply for leave to file her appeal

7    without paying costs, and if she requests, the Clerk of the

8    Court will prepare and file a notice of appeal on her behalf.

9    With few exceptions any notice of appeal must be filed within 14

10   days after the judgment is entered in the case, which should

11   happen today.  Do you understand your right to an appeal?

12         THE DEFENDANT:  Yes.

13         THE COURT:  All right.  Now, I think your client -- I

14   have heard something about suicide, but I can't really imagine

15   your client would seriously entertain that with a young child.

16         MR. SAVIELLO:  No, Your Honor, that was --

17         THE COURT:  I don't think she's a flight or danger to

18   the community at this point, so I would consider her a good

19   candidate for voluntary surrender.

20         MR. SAVIELLO:  Great.

21         THE COURT:  That's one of your concerns.  The

22   other concern, I'm happy to recommend some general location for

23   her to serve her sentence, but I'm pretty sure she is going to

24   wind up in Florida.  That's probably the closest women's

25   penitentiary.

1      MR. SAVIELLO:  We would ask the Court recommend as close

2   to metro Atlanta as possible.  Her family and children are here,

3   and easing the ability to visit would greatly ease her mind,

4   Your Honor.

5      THE COURT:  All right.  Incarceration near Atlanta.

6      MR. SAVIELLO:  And so, Your Honor, we would also ask for

7   voluntary surrender.  Again, she's had no problems on pretrial

8   release.  We believe she is a good candidate for that and she

9   will appear at the time and place as appropriate.

10      THE COURT:  Is that all?

11      MR. SAVIELLO:  That's all.

12      THE COURT:  All right.  So ordered.  Well, I'll make

13   that recommendation.  Let me explain to her and her family.

14   While I can recommend the general location of your

15   incarceration, the Bureau of Prisons does not have to follow my

16   recommendation and if they do not, there is nothing I can do

17   about it, but you are better off with that recommendation than

18   not having that recommendation in my opinion.  But if you wind

19   up in New York, Montana, wherever, there is nothing I can do

20   about it, as I corresponded with a fellow last week about.

21      All right.  Is there anything else I need to take up

22   with Ms. Scott's case?

23      MS. HOYT:  Not on behalf of the United States.

24      MR. SAVIELLO:  Not for the defendant.  Thank you, Your

25   Honor.

1        THE COURT:  All right.  We'll be in recess until after

2   lunch.

3                    **C E R T I F I C A T E**

4

5        I, Martha J. Frutchey, do hereby certify that I am a U.S.

    District Court Reporter for the Northern District of Georgia,

6

    Atlanta Division; that I reported the foregoing and the same is

7

    a true and accurate transcription of my shorthand notes as

8

    taken aforesaid.

9

10

11        _____

            Martha J. Frutchey

12

13

14

15

16

17

18

19

20

21

22

23

24

25